Thomas W. SANDERS, Appellant,

v.

John L. McCLELLAN et al., Appellees.

Nos. 24507, 24728.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 26, 1972.

Decided April 19, 1972.

Mr. Gerald M. Stern, Washington, D. C., with whom Messrs. Melvin L. Wulf, New York City, and Lawrence Speiser, Washington, D. C., were on the pleadings, for appellant.

Mr. Robert L. Keuch, Atty., Dept. of Justice, with whom Messrs. J. Walter Yeagley, Asst. Atty. Gen., and Benjamin C. Flannagan, Atty. Dept. of Justice, were on the pleadings, for appellees.

Mr. Stanley L. Temko, Washington, D. C., with whom Mr. John E. Vanderstar, Washington, D. C., was on the memorandum, for Authors League of America, amicus curiae.

Before FAHY, Senior Circuit Judge, and McGOWAN and ROBINSON, Circuit Judges.

FAHY, Senior Circuit Judge:

Appellant Sanders, plaintiff in the District Court, publishes in Berkeley, California, a journal called "Black Politics," in which have appeared articles under the pseudonym "George Prosser." It is undisputed that in some of the articles, as found by the District Court, Mr. Prosser "details how to accomplish sabotage and terrorism, suggests various targets, and explains how to manufacture explosives."

Appellees, defendants in the District Court, include the Chairman and Members of the Senate Permanent Subcommittee on Investigations, a Subcommittee of the Senate Committee on Government Operations, and the General Counsel of the Subcommittee.[1]

By Senate Resolution 308, of February 16, 1970, the Senate Committee on Government Operations, or any duly authorized Subcommittee thereof, which includes appellee Subcommittee, was authorized and directed to make,

a full and complete study and investigation of riots, violent disturbances of the peace, vandalism, civil and criminal disorder, insurrection, the commission of crimes in connection therewith, the immediate and longstanding causes, the extent and effects of such occurrences and crimes, and measures necessary for their immediate and long-range prevention and for the preservation of law and order and to insure domestic tranquility within the United States.

Under subpoena authority granted by this Resolution, the Subcommittee issued, and on July 1, 1970, served upon appellant, a subpoena *duces tecum* to appear to testify before the Subcommittee at a time which was eventually set as August 5, 1970. He was directed to produce documents and records as now set forth:

1. Copies of all back issues of Black Politics, which contain articles written by one George Prosser; since 1 January, 1967.

2. Copies of all back issues of the publication Black Politics which contain advertisements of Panther Publications, Boulder, Colorado, and/or Normount Armament Company. The Combat Bookshelf, Forest Grove, Oregon; since 1 January, 1967.

3. All records and documents, in your possession, custody or control, including but not limited to, correspondence, cancelled checks, interoffice memoranda, and payroll records concerning payments and/or commissions from Black Politics to George Prosser or his agents, and also concerning his identity and last known address either business or personal or both, since 1 January, 1967.

---

1. We shall at times refer to appellees collectively as the Subcommittee.

## I

On August 3, 1970, plaintiff filed suit in the District Court against the Subcommittee, alleging, *inter alia*, that the articles referred to in the subpoena had been submitted to "Black Politics" on the condition that the identity of the author remain in confidence, that the purpose of "Black Politics" is to provide a forum for vanguard theories and ideas, that freedom of the press requires the press to be able to guarantee to members of the public that their names will not be exposed in articles contributed by them, otherwise it is probable many important views would not be expressed through news media, that identities of contributors are protected by the First Amendment against compulsory exposure, and finally, "the compelled appearance of plaintiff before the Subcommittee will have a drastic, chilling and repressive effect upon First Amendment freedoms."

The complaint prayed for a permanent injunction restraining the Subcommittee from seeking to enforce the subpoena and from requiring appellant to reveal the identities of authors of articles and confidential associations or sources of information received in gathering material for publication. The complaint also prayed for a declaratory judgment that the subpoena and Resolution 308 are void under the Constitution.

On August 3, 1970, the District Court denied plaintiff's motion for a temporary restraining order as presenting a nonjusticiable issue, citing Pauling v. Eastland, 109 U.S.App.D.C. 342, 288 F.2d 126 (1960), as controlling authority. On plaintiff's motion of the same date for summary reversal or injunction pending appeal,[2] this court ordered that enforcement of and compliance with the subpoena be stayed to enable this court to consider the motion more fully. We also provided that our order should not prevent the District Court from proceeding expeditiously to hear applications for preliminary and permanent injunctions.

Pending resolution by this court of the appeal from the denial of the temporary restraining order, plaintiff moved in the District Court for a preliminary injunction. The District Court, with a careful accompanying opinion, granted the defendant Subcommittee's motion to dismiss. Again, relying principally upon Pauling v. Eastland, *supra*, the District Court held the complaint did not present a justiciable issue.

On October 23, 1970, plaintiff-appellant filed in this court a motion for summary reversal of the dismissal of the complaint.[3] Appellees have filed motions for summary affirmance of both District Court orders denying injunctive relief, and for vacation of the stay entered by this court. By order of this court of December 21, 1971, both appeals were consolidated for all purposes. Since the questions involved have been fully briefed and argued, the parties have agreed to submit the cases for final disposition as though reached on the regular calendar.

## II

We affirm the order of the District Court dismissing the complaint, though for a different reason from that assigned by the District Court. We think a justiciable issue was presented, but we find a case is not made for the exercise by the District Court of its equity powers to grant injunctive or declaratory relief.

We are now advised by his counsel's brief that appellant "has never refused to appear to produce non-confidential information required by the subpoena duces tecum," and that as "the District Court Judge pointed out in his opinion below, 'plaintiff has no objection to producing the issues of *Black Politics* called for by paragraphs 1 and 2 of the subpoena.'" Moreover, because of the posture of the case, the claim of unconstitutionality of Resolution 308 is not pressed, and, as shall appear, in Part IV

---

2. No. 24,507 in this court.

3. No. 24,728 in this court.

of our opinion, we have no doubt as to its validity. The question pressed for decision is fairly stated to be whether the plaintiff is entitled to an injunction or a declaratory judgment that would enable him to refuse to appear before the Subcommittee, free of the possibility of a contempt citation, in response to the request for all records and documents that pertain to the identity of George Prosser. We assume appellant also seeks like relief which would excuse him from being questioned with respect to confidential sources of information in connection with his publication.

### III

We consider first the question of justiciability. The Subcommittee contends that the District Court correctly ruled under Pauling v. Eastland, *supra*, that, on the ground of separation of powers, the District Court is without jurisdiction to interfere with the congressional investigation. Mr. Pauling had been directed to supply a subcommittee of the Senate with letters which had been transmitted to him from signatories of a petition to the United Nations for cessation of the testing of nuclear weapons. He sued on First Amendment grounds to be protected by the court from furnishing the letters. In an opinion affirming the order of the District Court dismissing the complaint as premature, the court held that the issue sought to be presented was non-justiciable due to the absence of definitive action against Mr. Pauling.[4] The opinion relied upon the "basic general principle [that] a court cannot in-terfere with or impede the processes of the Congress by proscribing anticipatorily its inquiries," a position thought to be required by the constitutional doctrine of separation of powers and by "simple procedural efficiency." The opinion states: "The courts have no power of interference, unless and until some event, such as arrest, indictment or conviction, brings an actual controversy into the sphere of judicial authority." Thus, the court could as well have affirmed on the independent ground of premature resort to the court. Moreover, as the court pointed out, "Pauling concedes that he could not obtain from a court an injunction against the contemplated action of the defendant Subcommittee, or of the Senate," but did claim the right to a declaratory judgment. In response to this claim the court reasoned, we think correctly, that in the situation presented such relief would amount in substance to an injunction.

The view of non-justiciability reflected in *Pauling* is not altogether consistent with subsequent decisions of the Supreme Court and of this court:

In Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), in deciding that the question of state legislative reapportionment is not political and is justiciable, the Court gathered into six categories cases involving questions historically deemed political and non-justiciable.[5] Our case falls into none of these categories; and no more stringent criteria apply when the issue, as here, is expressed in terms of separation of powers.

---

4. Judge Bazelon, the third member of the division, concurred only in the result.

5. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for· nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence.
369 U.S. at 217, 82 S.Ct. at 710.

In Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), appellants sought injunctive and declaratory relief in a federal District Court against prosecution or threatened prosecution by appellees—a state Governor, state police, state law enforcement officers and a chairman of a state legislative committee—under a statute alleged on its face to be unconstitutionally overbroad. A three-judge District Court held that it must abstain from exercising jurisdiction since a possibly narrowing construction of the statute could be given, eliminating a potentially unnecessary decision of a constitutional question. The Court reversed, holding that in the special circumstances alleged, in support of which proof was offered, a chilling effect operated against the exercise of legitimate civil rights and that to defend in a criminal prosecution did not afford an adequate remedy. In this situation the Court held that when the plaintiffs' conduct was not alleged to fall within a narrowed construction of the statute a federal court should not abstain from passing on their claim for injunctive and declaratory relief. In Part IV we shall refer more fully to the factual situation which led to this decision. We now note that the decision supports the justiciability of the issue in Mr. Sanders' case.

In Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), relying upon Baker v. Carr, *supra*, the Court held that the "textually demonstrable constitutional commitment" of judging the qualifications of its Members granted to Congress extended only to age, citizenship and residence. The Court accordingly held that the exclusion by the House of Representatives of a Member based on a judgment that he was unqualified for reasons other than age, citizenship and residence was subject to judicial review.

Turning to the decisions of this court, in Krebs v. Ashbrook, 132 U.S.App.D.C. 176, 407 F.2d 306 (1968), we adopted the opinion of the District Court, reported at 275 F.Supp. 111 (1967). The District Court had dissolved a three-judge court on the ground that Rule XI of the House of Representatives was an internal legislative rule not within the contemplation of the statute authorizing the convening of a three-judge court to hear challenges to the constitutionality of Acts of Congress. The court accordingly referred the challenge to a single district judge. *Krebs* is noteworthy because the question of constitutionality of Rule XI was not held to be non-justiciable.

The following year we held that the issue of the validity of a portion of the "Hershey directive" which recommended reclassification of draft registrants for protest activity was justiciable since the directive was (1) unauthorized by the selective service statutes or implementing regulations, (2) was capable of immediately chilling protected political dissent, and (3) the constitutionality of the threatened chill could not adequately be tested by awaiting criminal proceedings that might follow appellant's refusal to report for induction. National Student Association v. Hershey, 134 U.S. App.D.C. 56, 412 F.2d 1103 (1969).

Two other cases decided by this court clearly indicate that a challenge to legislative investigative authority may be justiciable, although in each the allegations of the complaint failed to present the type of controversy required by Article III. Davis v. Ichord, 143 U.S. App.D.C. 183, 442 F.2d 1207 (1970), and Cole v. McClellan, 142 U.S.App.D.C. 24, 439 F.2d 534 (1970).

In Ansara v. Eastland, 143 U.S.App. D.C. 29, 442 F.2d 751 (1971), the appeal was taken from the denial of a request for emergency injunctive relief from a legislative subpoena, on the ground that the authorizing resolution was overbroad. We held that such relief was properly denied since it would precede the legislative hearing at which appellants would have an opportunity to present their constitutional objections to the Committee. The case is presently important in the failure of the court again to hold it lacked jurisdiction. Delaying judicial decision,

we held, avoids needless friction with a coordinate branch of government.[6]

John Doe v. McMillan, 148 U.S.App. D.C. 280, 459 F.2d 1304 (1972), is not a decision to the contrary on the issue of justiciability in such a case as the present. It was concerned with the immunity of Members of Congress and their agents under the Speech and Debate Clause of the Constitution, and also as such immunity applied to the publication by the Committee of data procured by committee investigation.[7]

■ In Mr. Sanders' case governmental action affecting him has been taken by the issuance and service upon him of a subpoena *duces tecum* which seeks disclosures which he alleges chill his right of free press protected by the First Amendment, particularly as such disclosures would invade a confidential area of news-gathering and authorship of articles such as were published in "Black Politics." Although not allegations of the kind of congressional action required by *Pauling* to invoke judicial jurisdiction, the decisions since *Pauling* bring such action across the threshold of such jurisdiction. Under those decisions there is presented now a claim of an individual that his constitutionally protected freedom is invaded by definite action taken under governmental authority. Assumption of jurisdiction of such a complaint does no violence to the doctrine of separation of powers, for the matter falls within the responsibility entrusted to the judiciary, however reluctant the latter may be to assume jurisdiction when the action challenged is that of a coordinate branch of the Government. Hutcheson v. United States, 369 U.S. 599, 622, 82 S.Ct. 1005, 8 L.Ed. 2d 137 (1962). Applying to the problem

of separation of powers the same criteria applicable where the question is one of non-justiciability because the problem is said to be political, Baker v. Carr, our footnote 5, *supra*, we find no barrier to the assumption of judicial responsibility, to be exercised with caution as to the kind of remedy which might be afforded.

## IV

■ It does not follow that appellant is entitled to the relief he seeks. That depends upon considerations which differ from those which are decisive as to justiciability. We think Mr. Sanders does not make a case entitling him to injunctive or declaratory relief which would excuse him from appearing in response to the subpoena. Our reasons are now stated.

We first note the existence, apart from resort to our jurisdiction in equity, of an orderly and often approved means of vindicating constitutional claims arising from a legislative investigation. A witness may address his claims to the Subcommittee, which may sustain objections. Were the Subcommittee to insist, however, upon some response beyond the witness' conception of his obligation, and he refused to comply, no punitive action could be taken against him unless the full Committee obtained from the Senate as a whole a citation of the witness for contempt, the citation had been referred to the United States Attorney, and an indictment returned or information filed. Should prosecution occur, the witness' claims could then be raised before the trial court. *See* Wilson v. United States, 125 U.S.App.D.C. 153, 369 F.2d 198 (1966). *See generally* C. Beck, Contempt of Congress (1959); R. L. Goldfarb, The Contempt Power (1963).[8]

---

6. The Second Circuit in Wolff v. Selective Service Board, 372 F.2d 817 (2d Cir. 1967), has held justiciable the issue of reclassification of registrants as I–A by a local draft board because of their participation in a demonstration protesting American involvement in Vietnam. A postponed review of the question was thought to be an inadequate manner of

vindicating the immediate chill to the dissent from national policies.

7. For earlier history of John Doe v. McMillan, see Doe v. McMillan, 143 U.S. App.D.C. 157, 442 F.2d 879 (1971).

8. Plaintiff does not suggest that the more summary power of Congress directly to hold a relcalcitrant witness in contempt,

Given such procedures and the recognized reluctance of courts to interfere needlessly with the legitimate functioning of a coordinate branch of government, we turn to whether the facts presented by Mr. Sanders constitute a threat to the freedom of the press that is sufficiently concrete and compelling to warrant judicial interruption of the procedure outlined.[9]

■■ As a threshold matter, we dispose of any question as to the validity of Resolution 308, set forth in pertinent part above. That Congress has the power to investigate the causes and the impact of rioting and violent civil disorders is hardly disputable. A legislature with a broad knowledge of the causes of violent disorder is of course better able to fulfill its responsibility than one with more limited information. The Supreme Court has recognized the wide ambit permitted legislative investigations, as an indispensable adjunct to the lawmaking task:

> The power of the Congress to conduct investigations is inherent in the legislative process. That power is broad. It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes. It includes surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them. It comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste. But, broad as is this power of inquiry, it is not unlimited.

Watkins v. United States, 354 U.S. 178, 187, 77 S.Ct. 1173, 1179, 1 L.Ed.2d 1273 (1956). *See also* Shelton v. United States, 131 U.S.App.D.C. 315, 404 F.2d 1292 (1968).

■■ It is argued that notwithstanding the propriety of a legislative investigation into violent civil disorder, Resolution 308 is unconstitutionally vague and overbroad. While the Resolution does not articulate specifically all the means and sources to be utilized to gather information, we do not believe it need do so. We do not find Resolution 308 overbroad on its face. Moreover, a legislative investigation may require some scrutiny of the exercise of what may be claimed to be a constitutionally protected freedom. We think that to hold otherwise would unduly constrict Congress' investigatory powers.[10]

Mr. Sanders also attacks Resolution 308 as applied to him, that is, he attacks the subpoena *duces tecum* as unconstitutional. We do not understand his challenge to the subpoena to be that it goes beyond the scope authorized by Resolution 308. Rather, we understand his challenge to be that the subpoena requests information which Mr. Sanders maintains must be protected from disclosure by the First Amendment freedom of the press.

To rule with him would require us to ignore the regular procedure for testing witness' claims. In the period before Baker v. Carr, *supra,* and Dombrowski v. Pfister, *supra,* all cases challenging some aspect of legislative investigations and decided by the Supreme Court were on appeals from contempt convictions. *E. g.,* Hutcheson v. United States, *supra;* Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960); Barenblatt

---

*cf.* Groppi v. Leslie, 404 U.S. 496, 92 S.Ct. 582, 30 L.Ed.2d 632 (1972), with habeas corpus available to him to test the validity of such action, is considered relevant to the relief he seeks.

9. The stay entered by this court August 4, 1970, as our order stated, was only to afford an opportunity for further study, notwithstanding the unfortunate delay

which has occurred in the progress of the case toward decision.

10. We do not have the question whether legislation which might eventuate would be valid. Legitimate investigation might result in unconstitutional legislation. But we decline to anticipate what Congress may constitutionally enact in the way of legislation designed to counter violent social disorder.

v. United States, 360 U.S. 109, 79 S. Ct. 1081, 3 L.Ed.2d 1115 (1959); NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Watkins v. United States, *supra;* United States v. Bryan, 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884 (1950); United States v. Fleishman, 339 U.S. 349, 70 S.Ct. 739, 94 L.Ed. 906 (1950). The only pre-*Baker* cases in this court otherwise arising were decided against the witness. In Hearst v. Black, 66 App.D.C. 313, 87 F.2d 68 (1936), a Special Senate Committee to Investigate Lobbying Activities sought the help of the Federal Communications Commission in obtaining copies of telegrams sent to and from William Randolph Hearst's Washington offices. Copies of such messages were turned over to the Committee by the Commission and Hearst sought to enjoin their use in the investigation of lobbying by injunction against the Committee Chairman. This court declined to enjoin the Committee under the doctrine of separation of powers. While less explicit than in *Hearst,* the court in Mins v. McCarthy, 93 U.S. App.D.C. 220, 209 F.2d 307 (1953), declined to pass on an investigative act of the legislature because the witness' resort to the judiciary was premature. The third pre-*Baker* case, Pauling v. Eastland, *supra,* also represents a refusal to interrupt the legislature, once again in deference to the requirements of separation of powers.

Since *Baker* and *Dombrowski,* subpoenaed witnesses have more often than before sought to bypass the regular procedure referred to, by invoking the equity powers of the judiciary. However, in each of these cases finally decided by this court [11] in which injunctive or declaratory relief has been sought with respect to an ongoing congressional investigation, the relief has been denied, if not always for the same reason. Krebs v. Ashbrook, *supra;* Davis v. Ichord, *supra;*

Cole v. McClellan, *supra;* Ansara v. Eastland, *supra.*

It is urged now that earlier cases are inadequate to the task of measuring Mr. Sanders' claims. He presses the principles of Dombrowski v. Pfister, *supra,* as authority for granting relief before he has formally presented his objections to the Subcommittee. As we have seen, he alleges that his producing the documents and records requested by paragraph 3 of the subpoena would reveal a confidential source of timely information and ideas which would have the effect of drying up his sources of news on particularly sensitive subjects. He asserts that this impairment of news-gathering ability and publication is an impermissible chill of his First Amendment right to a free press that cannot be adequately eliminated if he is required to comply with the Subcommittee's request.

In *Dombrowski* not only were there involved threats of prosecution under a state statute, challenged as excessively broad and susceptible of application in violation of the rights asserted, but it was alleged that the statute was being used in bad faith, not to secure convictions but to deter plaintiffs in the exercise of their legitimate civil rights. The situation demonstrated that potential criminal proceedings would not afford plaintiffs adequate protection. The Supreme Court accordingly held that the District Court erred in dismissing the complaint for failure sufficiently to allege irreparable injury justifying equitable relief.

The present case is not factually comparable. The difference appears clearly from the Court's consideration of *Dombrowski* in the recent case of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The question there was whether a federal District Court should restrain a prosecution under a state Criminal Syndicalism Act, also al-

---

11. In Doe v. McMillan, 143 U.S.App.D.C. 157, 442 F.2d 879 (1971), this court issued a stay, pending a final decision on the merits, enjoining the publication of the names of students and their parents in that part of a report on the District of Columbia school system containing test scores and a recital of disciplinary difficulties. *See* note 2 *supra.*

leged to inhibit the exercise of rights of speech and press protected by the First and Fourteenth Amendments. In this instance, unlike in *Dombrowski*, the Court reversed the action of the District Court in enjoining the criminal prosecution. The Court said:

> [T]he existence of a "chilling effect," even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action. Where a statute does not directly abridge free speech, but—while regulating a subject within the State's power—tends to have the incidental effect of inhibiting First Amendment rights, it is well settled that the statute can be upheld if the effect on speech is minor in relation to the need for control of the conduct and the lack of alternative means for doing so.

401 U.S. at 51, 91 S.Ct. at 754.[12]

██ In the opinion for the Court by Mr. Justice Black—a foremost exponent of the protected character of speech—the Court applied a test of comity in determining whether the Court should use its equity powers to enjoin a state prosecution under a state statute alleged as in *Dombrowski* to be void on its face as an infringement of freedoms protected by the First and Fourteenth Amendments. Justice Black's opinion relied upon a traditional policy, based on our Federalism, which calls for restraint by the federal judiciary in the use of its equity power to enjoin a state prosecution, even to protect such rights.[13] The situation before us now is analogous when considered in connection with the possible use of the equity power of the court. Ours is not a case of comity between federal and state sovereigns. It does present, however, the analogous problem of the relationship between two coordinate branches of the same government, and so is akin to the comity between Nation and State relied upon in *Younger*.[14] The judiciary has the duty "of not lightly interfering with Congress' exercise of its legitimate powers." Hutcheson v. United States, 369 U.S. at 622, 82 S.Ct. at 1017. We recently discussed this duty at some length in Ansara v. Eastland, *supra*. While we have held in Part III of this opinion that the deference due to Congress does not render the issue nonjusticiable, nevertheless, the court must not intervene prematurely or unnecessarily. So viewing the problem, and concluding that the situation in *Dombrowski* is not comparable, we think no case is made for the court in the exercise of its equity power to excuse Mr. Sanders from appearing in resonse to the subpoena. In the language of Younger v. Harris, 401 U.S. at 46, 91 S.Ct. 746, there is no irreparable injury of "great and immediate" character, and the possibility or even probability that his appearance may indirectly and incidentally inhibit the flow of information from confidential sources is not a bar

---

12. For a discussion by our own court of differences in chilling effects as such differences bear upon the claims of rights to equitable relief see National Student Ass'n v. Hershey, *supra;* Davis v. Ichord, *supra*, where Stamler v. Willis, 415 F.2d 1365 (7th Cir. 1969), is discussed.

13. That the basis for the Court's position was the comity arising from Federalism, and not the anti-injunction statute, 28 U.S.C. § 2283, *see* the concurring opinion of Mr. Justice Stewart, with whom Mr. Justice Harlan concurred. 401 U.S. at 54, 91 S.Ct. 746. *And see* Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972), footnote 27 and accompanying text (1972).

14. We note another difference between the present case and Younger v. Harris, where the Court pointed out that the prosecution complained of was under way, indicating the Court reserved its position were it presented with a situation where a prosecution under the invalid statute had not been initiated, 401 U.S. at 49, 91 S.Ct. 746, *and see* concurring opinion of Justice Stewart at 55, 91 S.Ct. 746. We do not believe these reservations significantly detract from our reliance upon Younger v. Harris to the extent we do so in the factual situation of Mr. Sanders' case, in its setting of a congressional investigation.

to congressional pursuit by the subpoena of its investigation of rioting, other disorders referred to, and their causes.

We have here the claim of a constitutionally protected First Amendment right on the one hand, and, on the other, an inquiry by Congress in furtherance of its constitutional responsibility in aid of lawmaking. The Supreme Court has consistently refused to accord an absolute protection to speech or press. Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); American Communications Ass'n v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950); Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951); Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); United States v. O'Brien, 391 U.S. 367, 88 S. Ct. 1673, 20 L.Ed.2d 672 (1968). "[T]here are constitutionally relevant interests that can be weighed against each other," in deciding whether the right claimed is within the protection of the First Amendment.[15] In determining whether we should use the extraordinary equity remedy of injunction, or a declaratory judgment which is a comparable form of relief in the circumstances, we think that the indirect and incidental chill which might result from the subpoena—there is of course no direct suppression of speech or press, what the Subcommittee has done is to issue and not withdraw the subpoena—does not outweigh the right of the Subcommittee, acting under valid congressional authority, to make its inquiries of Mr. Sanders free of prior judicial interference. We do not decide what information or answers he may validly be required to give or the validity of any objections he might make. Mr. Sanders may make his objections to the Subcommittee, including such objections as that it is not necessary now for the Subcommittee to use the subpoena to obtain the information it desires. We decline to answer for the Subcommittee in such matters prior to its own opportunity to do so.[16] Ansara v. Eastland, supra; cf. Shelton v. United States, supra. In weighing the relevant interests, the equities are not with Mr. Sanders, and it is to equity he appeals.

V

Except to say we do not find that they require a different view from that to which we now adhere, we refrain from comment upon the following cases now pending in the Supreme Court: Caldwell v. United States, 434 F.2d 1081 (9th Cir. 1970), cert. granted, 402 U.S. 942, 91 S.Ct. 1616, 29 L.Ed.2d 109 (1971); In re Pappas, Mass., 266 N.E.2d 297 (Sup. Jud.Ct.1971), cert. granted, 402 U.S. 942, 91 S.Ct. 1619, 29 L.Ed.2d 110 (1971); Branzburg v. Pound, 461 S.W.2d 345 (Ky.Ct.App.1970), cert. granted sub nom. Branzburg v. Hayes, 402 U.S. 942, 91 S.Ct. 1616, 29 L.Ed.2d 109 (1971); and we do not find Liveright v. Joint Committee etc., 279 F.Supp. 205 (M.D. Tenn.1968), sufficiently similar on its facts to be authority against our position, other questions aside.

The Stay entered in No. 24507, August 4, 1970, is vacated and the Order of the District Court dismissing the Complaint is affirmed in No. 24728.

---

15. For a recent and comprehensive analysis of the decisions see Canavan, "Freedom of Speech and Press: For What Purpose?" 16 Am.J.Jurisprudence 95, (1971).

16. There are, however, two matters to which we call attention. One is that appellant might not be able to bear financially the expense of personal appearance in Washington. If this is the situation we are open to further consideration as to what may be required in that regard.

The other is that notwithstanding the lapse of time since service of the subpoena, and possible intervening events affecting the aliveness of the issues presented, the parties have not suggested mootness, for which reason we do not discuss that possibility.